

Division



## Wolverine Corporation

PROPOSAL
No.
4673-W-EKL, Rev 1

51 East Main Street, Merrimac, Massachusetts 01860
Tel. (508) 346-4541 — Telex 94-7410
FAX (508) 346-4213

To
Patco Corporation
211 Weeden Street
Pawtucket, RI   02862

Attention: Mr. Bill Wilbur

Subject:  5000 SCFM Wolverine Thermal Oxidizer

Date
January 22, 1991



EXHIBIT
T vs. W 19/
1/6/04   KmS

Job 9103

Gentlemen:

We are pleased to submit to Patco Corporation our revised Proposal #4673-W-EKL, Rev 1 for one (1) 5000 SCFM Thermal Oxidizer. The incinerator will destroy the solvent-laden dryer exhaust (98% destruction efficiency). An option for hot gas feedback hardware is also submitted for your review.

A.  PRICE:

1. One (1) complete 5000 SCFM thermal oxidizer including natural gas burner, process exhaust blower, 60% heat exchanger, etc. as it is described in Section F of this proposal
----------------------------------------------- $151,500.00

2. Hot gas feedback hardward including insulated ductwork, temperature controller dampers, etc. as it is described in Section F of this proposal
----------------------------------------------- $ 15,700.00

$ 167,200.00

B.  TERMS:

- 30% down payment with formal purchase order.
- 20% net due midpoint to shipment.
- 25% net due upon inspection of the completed hardware on our shop floor prior to shipment, or upon offer to ship if inspection is waived by customer.
- 25% final payment net thirty (30) days from successful stack emission testing but not to exceed sixty (60) days from receipt of equipment.

Visits to our manuacturing facility to verify project progress are welcomed. Delay in payment milestones may affect delivery schedule.

WPS  000039

All orders based on this quotation are subject to acceptance by Wolverine Corporation

WOLVERINE CORPORATION

Patco Corporation
Proposal No. 4672-W-EX
January 22, 1991
Page 2
Rev 1

C.  **DELIVERY:**

Time of delivery of all equipment supplied by Wolverine will be approximately twelve to fourteen (12-14) weeks after placement of purchase order.

Freight carrier selection will be at the discretion of Wolverine Corporation unless otherwise specified by customer.

D.  **INSTALLATION AND/OR START-UP ASSISTANCE:**

We will provide installation and/or start-up assistance, if desired, at a rate of $480.00 per man, per 8 hour day, plus all living and travel expenses. Overtime is at $90.00 per hour, except on Sundays and holidays, which is at $120.00. Expenses are billed at cost. Travel time is billed at $55.00 per hour Monday through Friday, and $75.00 per hour Saturday and Sunday.

E.  **DESIGN SPECIFICATIONS:**

| | |
|---|---|
| Process Exhaust Temperature: | 200°F, approximately |
| Solvent Rate: | 264 lb/hr max. |
| Solvent Constituents: | Lactol, N-Hexane |
| Thermal Oxidizer Capacity: | 5000 SCFM |
| Normal Operating Temperature: | 1400°F (1450°F maximum continuous and 1500°F maximum instantaneous) |
| Residence Time: | 0.8 seconds |
| Destruction Efficiency: | 98%* |
| Thermal Oxidizer Fuel: | 1.0 psig natural gas |
| Electrical Requirements: | 208V/3Ph/60Hz supply 120V/1Ph/60Hz control |
| State of Compliance: | Rhode Island |
| Insurance Underwriter: | Patco to confirm |

*98% destruction efficiency guaranteed by Wolverine Corporation

**WOLVERINE** CORPORATION

Proposal No. 4673-W-EKL, Rev 1
January 22, 1991
Page 3

F. <u>HARDWARE DESCRIPTION:</u>

1. One (1) 5000 SCFM thermal oxidizer with 60% heat exchanger and all required controls will be supplied if Option A.1. is purchased and will include the following:

   - Construction will be horizontal design with structural mounting base (channels) for anchoring to concrete pad.

   - Unit will include welded reinforced heavy gauge mild steel insulated on inside with 6 inches of high density ceramic fiber batting modules.

   - The approximate dimensions of the incinerator are 28 ft long by 6 ft wide by 6 ft high. Approximate weight is 17,000 pounds.

   - A 60% heat exchanger of shell-and-tube type design will be provided and constructed as an integral part of the incinerator body. Tubes constructed of 304 stainless steel.

   - Dryer exhaust will be preheated on shell side of the exchanger from 200°F (approx) to 920°F.

   - A Maxon (or equal) line type burner with internal gas piping and supports. The burner will be rated for 2,000,000 Btu/hr; however, the maximum capacity will be used for start-up only and then throttled down to low fire to accommodate process requirements.

   - The burner will be equipped with prepiped, insurance underwriter approved, natural gas safety train and temperature controlled modulating gas flow control valve.

   - The incinerated exhaust will be retained in the combustion chamber at 1400°F for 0.8 seconds to achieve a minimum 98% destruction efficiency.

   - Combustion chamber will be furnished with pilot and ignition components, UV scanner, viewport and covered access doors for inspection and servicing.

   - A bypass duct to bypass the exhaust directly to the burner instead of preheating in the heat exchanger will also be supplied. In the event of solvent overload, which will result in excessive temperature, a set of temperature controlled face and bypass dampers will activate and direct the exhaust to the burner, allowing for personnel to take corrective action at the solvent source without disrupting the oxidizer operation.

**WOLVERINE** CORPORATION

Proposal No. 4673-W-EKL, Rev 1
January 22, 1991
Page 4

F. <u>HARDWARE DESCRIPTION:</u>   continued ...

- A 15 HP exhaust blower to convey exhaust from the process to the oxidizer unit will be provided. The blower will include motor, V-belt drive, motor starter, and an OSHA-approved guard.

- An exhaust stack 37 feet high and 26 inches inside diameter will also be furnished. Capped testing parts for stack testing will be provided. Stack material is Corten.

- Incinerator exterior and stack will be painted with a high temperature silver paint for pleasant outward appearance.

- A free-standing NEMA 12 control panel for installation in an indoor non-hazardous location will be furnished for the thermal oxidizer system. The panel is supplied with disconnect, fan motor starter equipment, burner ignition controls and flame monitoring equipment, on/off pushbuttons and status lights, a Honeywell single pen temperature recorder/controller, and all required interlocks, relays and alarms.

2. If Option A.2 is purchased, hot gas feedback ductwork will be furnished as follows:

- It is estimated that 2200 SCFM of 600°F hot gas will be needed to satisfy process heat loads.

- Hot gas feedback main trunk from the exit end of the tubes of the heat exchanger will be 17 inches inside diameter.

- Main trunk will split off into two (2) separate 12 inch I.D. ducts to feed two (2) dryer locations.

- Each 12 inch diameter duct will be supplied with one (1) hi-temp motorized damper. Each damper will control the hot gas volume back to the dryer.

- All ductwork will be constructed of aluminized steel, insulated with 6 inches of fiberglass and externally clad with aluminized sheet.

- The temperature controllers will be mounted in the incinerator control panel.

WPS 000042

WOLVERINE CORPORATION

Patco Corporation
Proposal No. 4673-W-EKL, Rev 1
January 22, 1991
Page 5

G. **EXCLUSIONS:**

1. All federal, state and local licenses, taxes and permits.
2. All freight costs to site.
3. All installation costs, unless purchased.
4. Equipment lighting.
5. All raw material, and utility costs which may be incurred during start-up, debugging and testing.
6. Tie-in of utilities to main panel.
7. Wiring and piping.
8. Stack test costs. If incinerator does not pass initial stack test, Wolverine will be responsible for subsequent testing and resulting stack testing fees until test is passed (98% destruction and efficiency).
9. Spare parts unless purchased.
10. Exhaust ductwork from dryer to incinerator.
11. Hot gas feedback ductwork, unless purchased.
12. Costs incurred from the relocation of existing interferences.
13. Flashing and weatherproofing of wall opening.
14. LEL control instrumentation and hardware.
15. Any items not specifically quoted.

H. **GENERAL:**

1. Equipment shall confirm to OSHA, FM and IRI guidelines (customer to confirm).

2. It is recommended that customer inspect and approve the completed hardware on our shop floor prior to shipment.

3. Fan motor is TEFC AC.

4. Customer to approve general arrangement drawings, airflow, electrical, gas and pneumatic schematics prior to completion of detail engineering, prior to purchase of parts and materials, and prior to manufacture. Revisions after approval may affect price and delivery schedule.

5. Three (3) manuals will be furnished containing start-up, shut-down, operation and maintenance instructions, as-built general arrangement drawings and control schematics, recommended spare parts lists with prices for one (1) year of operation, and catalog information on commercially purchased components.

Thank you for your interest in Wolverine Corporation. If you have any questions regarding our proposal, please do not hesitate to call.

Very truly yours,

WOLVERINE CORPORATION

Eric K. Long
Applications Engineer

WPS 000043



Wolverine Corporation
WPS 00039A

# TERMS AND CONDITIONS

**1. ACCEPTANCE BY SELLER:** Wolverine Corporation, Haviten Tool and Machine Company ("Seller") hereby offers to sell to the addressee named on the face hereof (the "Buyer") the equipment listed on the face hereof (the "Equipment") for the price(s) indicated, on the express condition that the Buyer agrees to accept and be bound by all the terms and conditions herein. Unless withdrawn or modified by Seller this offer may be accepted by Buyer by any of the following: (a) written, telephonic or telegraphic acceptance received by Seller within 30 days unless otherwise specified, or (b) shipment by Seller of and Buyer's acceptance of or payment for, all or any of the Equipment. A response by Buyer in any of the foregoing manners shall (subject to the provisions of Clause 3 hereof) constitute acceptance by Buyer of all terms and conditions hereof and (unless already confirmed in the manner hereafter indicated) further constitutes Buyer's agreement to confirm such acceptance by promptly sending this form, duly signed by Buyer, to Seller.

**2. SALES AGREEMENT:** The agreement between Seller and Buyer (the "Sales Agreement") with respect to the Equipment shall consist of the terms and conditions contained herein together with any modifications or additions thereto mutually agreed to in writing by Seller and Buyer. The Sales Agreement, as modified or supplemented as provided herein, shall constitute the entire agreement of Seller and Buyer with respect to the transaction contemplated hereby. No prior or contemporaneous courses of dealing or written or verbal agreements, to the extent that they differ in any way from the written terms and conditions of the Sales Agreement, shall be binding on the Seller or be construed to alter, repeal or invalidate the Sales Agreement.

**3. PAYMENT AND CREDIT:** Terms of payment (unless otherwise provided on the face hereof): a discount of one half of one percent (0.5%) for cash payment in full on or before 10 days after the date of shipment; net cash payment on or before 30 days after date of shipment. If, in the exclusive judgment of Seller, the financial condition of the Buyer at any time does not justify the commencement or continuance of production or shipment on the terms specified herein, Seller may, in addition to all other remedies it may have at law or in equity, make a written demand for full or partial payment in advance; suspend its performance until such payment is made, and cancel the Buyer's order if such payment is not received by Seller within thirty (30) days after the mailing of demand by Seller.

If Buyer and Seller agree that the payment of any part of the price of the Equipment be received by Seller before the commencement of production, the Seller shall be under no obligation to commence production unless and until such payment is recieved, and in any event may cancel this Sales Agreement if such payment is not recieved within 30 days of the date hereof.

Unless otherwith indicated on the face hereof, terms are F.O.B. point of origin.

Remittance should be forwarded to Wolverine Corporation, P.O. Box 5524, Boston, MA 02206.

If shipments are delayed by or at the request of the Buyer, payment shall become due from the date when Seller is prepared to make shipment. Any equipment held for the Buyer because of such delay on delivery shall be at the sole risk and expense of the Buyer.

If more than one shipment is made, each may be invoiced separately.

Invoiced payments past due are subject to late charges of two percent (2%) per month of any unpaid invoice balance. Buyer shall not set off against or deduct from any amounts due hereunder all or any part of any damages which it may have sustained or alleged to have sustained arising out of any breach of the Sales Agreement by Seller or any other claim Buyer may have against Seller.

**4. TAXES:** All prices quoted herein do not include taxes or other governmental charges in respect of the production, sale, distribution or delivery of any Equipment or service related thereto. Buyer agrees to indemnify Seller against the imposition of, or increase in, any such taxes or charges after the date hereof, which Seller may be required to pay.

**5. SHIPMENTS AND DELIVERY:** Risk of loss or damage to goods shall pass from Seller to Buyer upon delivery of the Equipment to the carrier.

Shipping dates are approximate and based on prompt receipt of all necessary information by Seller.

Seller will not be liable for any delay in the performance of the Sales Agreement when such delay is directly or indirectly, caused by or in any manner arises from fires, floods, accidents, riots, war, governmental interference, embargoes, strikes, shortage of labor, materials or supplies, inadequate transportation facilities or any other cause or causes (whether or not similar in nature to any of those hereinbefore specified) beyond Seller's control.

In no event shall Seller be liable for incidental or consequential damages resulting from or arising in connection with any failure to meet any delivery schedule.

**6. SAFETY REQUIREMENTS:** Buyer shall notify Seller in writing of any safety devices for the Equipment which are not specifically included in the description of the Equipment which may be required by Federal, state or local law, rule or regulation. Notice by Buyer shall be in good time before the estimated date of delivery to permit installation by Seller of the required safety devices on the Equipment; if such safety devices are available and are approved by Seller as provided herein. Seller shall not be responsible for the inclusion and/or installation of safety devices on the Equipment to prevent personal injury or property damage for the adequacy of safety devices duly specified by the Buyer. Buyer agrees to indemnify and hold Seller harmless from and against all liability, loss, cost, damage or expense attributable to any claim against Seller for personal injury or property damage arising out of the installation, maintenance or operation of the Equipment by Buyer or others, whatever the cause or alleged cause of the personal injury or property damage may be.

**7. WARRANTY:** Seller warrants, to the original Buyer only, that every part of the Equipment covered by this proposal manufactured by it will be of proper materials and workmanship. In the Sellers range of this warranty, the Buyers sole and exclusive remedy against the Seller shall be for the repair or replacement, but not installation, of any such part which proves defective in material or workmanship within 1 year from date of said shipment of said Equipment to Buyer provided Buyer immediately gives Seller notice of such alleged defects and, if requested, returns the defective part to Seller's place of business at the address indicated on the face hereof, freight prepaid, for inspection. Seller shall not be liable for repair or replacement of any such parts unless effected by it or in accordance with written warranty, but are subject only to the warranties of their respective manufacturers.

In no event shall Seller's one-year warranty with regard to freedom from defects extend to any equipment in any way caused or allowed to be, installed, operated or used in a negligent or improper manner so as to be subject or exposed to conditions of abrasion, erosion, corrosion, excessive heat or other accident. Inasmuch as no alloys, materials, coatings or forms of construction are known to us which will successfully resist abrasion, erosion, corrosion, or deterioration from excessive heat, Seller not make any guaranties as to the life of equipment purchased by Buyer when subject to conditions w cause such damages.

Under no circumstances shall Seller be responsible or liable for any special, indirect, incidental or consequential damages arising in any way in connection with any Equipment or the Sales Agreement.

THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. NO WARRANTY OF MERCHANTABILITY, NO IMPLIED WARRANTY OF FITNESS FOR ANY PURPOSE, AND NO IMPLIED WARRANTY ARISING BY USAGE OF TRADE, COURSE OF DEALING, OR COURSE OF PERFORMANCE IS GIVEN BY SELLER OR SHALL ARISE BY OR IN CONNECTION WITH THE SALES AGREEMENT AND/OR THE SELLER'S AND BUYER'S CONDUCT IN RELATION THERETO OR TO EACH OTHER, AND IN NO EVENT SHALL SELLER BE LIABLE ON ANY SUCH WARRANTY WITH RESPECT TO ANY EQUIPMENT. ANY MODEL, SAMPLE, DRAWING OR OTHER ARTIFACT OR REPRESENTATION OF ANY KIND OF ANY EQUIPMENT SHOWN OR FURNISHED TO BUYER BY SELLER, IF ANY, WAS FOR ILLUSTRATIVE PURPOSES EXCLUSIVELY AND NEITHER DID NOR DOES CONSTITUTE ANY REPRESENTATION OR WARRANTY OF SELLER THAT ANY EQUIPMENT WOULD OR WILL CONFORM THERETO.

**8. INSTALLATION AND SERVICE:** Seller shall not be required to install, service, or provide any on-site engineering and/or site preparation for, any of the Equipment except as may be agreed upon in writing by Seller and buyer.

**9. PATENTS:** Buyer shall indemnify and hold harmless Seller against all liabilities or expenses arising from claims of infringement of patent, trademark or other registered mark or design with respect to Equipment manufactured to Buyer's specifications.

Seller is not responsible for any uses to which any of the Equipment may be put as a part of a mechanism or any process subject to any patent or other registered mark held by others.

**10. TRADEMARKS:** Unless otherwise agreed, Seller reserves the right to have its name trademark appear on each product sold hereunder, and to use such products or illustrations of the same display or advertising purposes.

**11. DRAWINGS AND SPECIFICATIONS:** Any drawings, prints or other information furnished by Seller in connection with the order are strictly confidential and shall not be used for any purpose other than in connection with Seller's products and equipment; all rights of Seller thereto are reserved and no drawing, print or other information shall be copied or distributed in whole or in part without prior permission from Seller. No equipment may be manufactured by Buyer or for Buyer by third parties from Seller's prints or designs (whether or not furnished to Buyer by Seller) without the prior consent of Seller.

**12. INSPECTION BY BUYER; CLAIMS FOR DAMAGES IN TRANSIT.** Buyer shall carefully examine and check all deliveries of Equipment made hereunder as they are received and to report within seven days to Seller any alleged error, shortage or defect or non-conformity of any such Equipment; any failure by Buyer so to examine and report shall constitute a waiver by Buyer of any claim or right of Buyer against Seller arising hereunder or by law with respect to any such error, shortage, defect or non-conformity reasonably discoverable by such an examination and check.

All claims by Buyer for damage or loss in transit shall be made by Buyer against the carrier.

**13. PERFORMANCE TESTING:** Any tests conducted to prove the performance of the Equipment shall comply with a test procedure agreed between Buyer and Seller. Unless otherwise stated, the price(s) set forth on the face hereof do not include the cost of any tests. The results of any tests so conducted shall be accepted by buyer as final and binding as to the performance or other specifications of Equipment tested.

**14. BUYER PROCESS:** Unless otherwise agreed, Seller does not guarantee Buyer process performance with respect to raw materials, final product, production speeds, and energy consumption. Seller shall not be obligated to make any modifications to the Equipment if requested after the date hereof by Buyer for process or experimental reasons discovered by Buyer, or due to the discovery of new technology by Buyer after the date hereof, or to meet specifications of Buyer not described to Seller on the date hereof.

**15. MODIFICATIONS AND CANCELLATIONS:** Except as expressly provided herein, the terms and conditions (whether as to the performance or safety of the Equipment, or otherwise) of the Sales Agreement may not be modified, terminated, or repudiated, in whole or in part, except by a writing signed by Seller and Buyer. Seller may, at its sole option, treat any attempted modification, termination or repudiation to which it does not agree in writing as a breach of the entire Sales Agreement and recover from Buyer all Seller's damages, including without limitation special, indirect, consequential and incidental damages resulting therefrom or arising in connection therewith. Seller may specify an increase in the price(s) set forth on the face hereof as a condition of its agreement to any modification of the Sales Agreement requested by Buyer. Upon any breach by Buyer or failure by Buyer to comply with any of the terms and conditions hereof or if Buyer becomes unable to conduct its normal business operations (including inability to meet its obligations as they mature) or becomes the subject of any proceedings under state or federal law for the benefit of creditors or relief of debtor or makes any assignment for the benefit of creditors, Seller shall have the right immediately to cancel or terminate the Sales Agreement, in whole or in such part as Seller in its sole judgement shall deem expedient, and recover from Buyer all damages, including without limitation special, indirect, consequential and incidental damages, suffered by the Seller as a result of, or arising in connection with such termination. If the Sales Agreement, or any part thereof, is modified or terminated by written agreement of the parties or otherwise as provided herein, unless otherwise agreed, buyer shall pay and be liable for modification or termination charges including (if applicable), without limitation, the following: (a) the price of any and all Equipment the manufacture of which by Seller is or was either completed or in process at the time of such written agreement or termination, plus (b) any and all expenditures made or incurred by Seller (including, without limitation, any expenditures or liabilities for raw materials, components, labor, engineering and start-up expenses) in connection with the entire Sales Agreement (including, without limitation, the uncompleted or modified portion of Buyer's order in connection therewith), plus (c) a reasonable estimated profit.

**16. REMEDIES NOT EXCLUSIVE:** No remedy of Seller provided herein shall be exclusive of any other remedy of Seller provided herein or allowed by law.

**17. ASSIGNMENT:** No rights, benefits or duties under the Sales Agreement, including the benefits of the warranty contained in Section 7 hereof, shall be assignable by Buyer without the prior written consent of Seller.

**18. GOVERNING LAW:** The Sales Agreement shall in all respects be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.