Exhibits: 189-226                Volume 1, Pages 1-236

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

THE TRAVELERS INDEMNITY COMPANY OF

ILLINOIS a/s/o PATCO CORPORATION,

                    Plaintiff

v.                            Docket No. 03-10164-RWZ

WOLVERINE (MASSACHUSETTS)

CORPORATION,

                    Defendant

          - - - - - - - - - - - - - - - - - - - - - - - - - - -

RULE 30(b)(6) DEPOSITION OF

WOLVERINE PROCTOR & SCHWARTZ

by and through ERIC K. LONG

Tuesday, January 6, 2004, 11:10 a.m.

Robinson & Cole LLC

One Boston Place

Boston, Massachusetts

--- Reporter:  Kathleen Mullen Silva, RPR, CRR ---

ksilva@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

30(b)(6) Deposition by Eric K. Long - 1/6/2004

**18**

1    A. I do not.

2    Q. Are you aware of anyone from Wolverine who

3  would have knowledge of how that relationship was

4  initiated?

5    A. No. There's a -- the only guy has been

6  retired for several years. I don't know where he

7  is, but his name is Ron Baser. He was there, and I

8  think he was the first contact with Patco. That's

9  my recollection.

10    Q. Are you aware that at some point in time

11  Patco purchased a thermal oxidizer from Wolverine?

12    A. Yes.

13    Q. Do you know when Patco purchased this

14  thermal oxidizer from Wolverine?

15    A. 1990, 1991, I believe.

16       (Marked, Exhibit 190, proposal,

17  1/18/91.)

18       (Marked, Exhibit 191, proposal,

19  1/22/91.)

20    Q. Mr. Long, I'm going to hand you two

21  documents. One has been identified as Exhibit 190,

22  and the second has been identified as Exhibit 191.

23  If you want to just take a few moments to look those

24  over.

**19**

1    A. (Witness reviewing documents.)

2    Q. Mr. Long, if you wanted to take a look at

3  the document that's been marked as Exhibit No. 190.

4  I believe there's a date on that document January

5  18, 1991, is that right?

6    A. Right.

7    Q. Have you ever seen that document before?

8    A. Yes.

9    Q. If you turn to the last page of that

10  document, is that your signature?

11    A. Yes.

12    Q. And the document marked Exhibit No. 191, I

13  believe that document is dated January 22, 1991.

14    A. Right.

15    Q. Have you seen this document before?

16    A. Yes.

17    Q. If you turn to the last page, is that your

18  signature on the last page?

19    A. Yes.

20    Q. Could you please describe for me what

21  Exhibit Nos. 190 and 191 are?

22    A. These are proposals for a thermal oxidizer

23  as proposed to Patco. It's a 5000 SCFM thermal

24  oxidizer with the features described under section

**20**

1  F, and with exclusions published in the back.

2    Q. Okay. And is the proposal dated January

3  22, Exhibit 191, is that a revision of the proposal

4  of January 18, 1991?

5    A. Yes, it is.

6    Q. Do you know if this proposal was revised

7  after January 22, 1991?

8    A. I don't know, but I think this is the

9  document that -- I think this is the proposal that

10  he accepted, so...

11    Q. And what proposal are you referring to?

12    A. Pardon me. It's Exhibit 191.

13    Q. And that's the proposal dated January 22,

14  1991?

15    A. That's correct.

16    Q. And to your knowledge, did Patco accept

17  this proposal from Wolverine?

18    A. Yes, they did.

19    Q. What was your personal role in Patco's

20  purchase of the thermal oxidizer referenced in the

21  Wolverine proposal?

22    A. I was the direct salesman for this

23  particular contract.

24    Q. And explain your duties as the direct

**21**

1  salesman.

2    A. Well, it would start by contact with the

3  customer, and it would develop into receiving

4  specifications from the customer, determining their

5  requirements, and developing the best solution for

6  their requirements, reflecting that solution with a

7  dollar value and following up to try to get their

8  business.

9    Q. Did you have any engineering duties with

10  respect to this proposal?

11    A. No engineering duties, no.

12    Q. If you could turn to page 3 of Exhibit No.

13  191, it's also identified by WPS 00041. If you'd

14  just take a look at that page. If you could explain

15  to me exactly what this proposal included.

16    A. Okay. This includes a thermal oxidizer,

17  which is a stand-alone piece of equipment that

18  destroys solvents generated from the customer's

19  process. So, in other words, they have a process.

20  The harmful solvents come off of that process, and

21  the oxidizer is supplied to destroy those solvents

22  at a guaranteed value; in this particular case, 98

23  percent destruction efficiencies.

24    Q. Were there any other components or

30(b)(6) Deposition by Eric K. Long - 1/6/2004

22

1  machinery provided with this proposal?
2      A. No.
3      Q. Did the thermal oxidizer itself contain
4  separate machinery or separate components?
5      A. The oxidizer is a pretty simple machine.
6  It's just an insulated chamber with a burner, and
7  the correct safeties within the oxidizer itself. So
8  there are no other machines, if you will, along with
9  the oxidizer.
10     Q. Did this proposal, Exhibit No. 191 that
11 we're looking at, contain a proposal for any sort of
12 ventilation system to accompany the thermal
13 oxidizer?
14     A. I'm not sure what your definition of
15 ventilation system is. Any exhaust duct work -- I
16 take ventilation meaning the exhaust duct work from
17 the source, which is the dryer to the oxidizer.
18 That is not included. So this oxidizer sits out on
19 a concrete pad. Anything inside the building, any
20 duct work up to the oxidizer is not included.
21     Q. What is a 15 HP exhaust blower?
22     A. That's a 15-horsepower -- that's a blower
23 with a motor on it which is rated for 15 horsepower.
24 So it spins the fan, given this energy here, and

23

1  pushes the air through the oxidizer, and then up
2  through the exhaust stack, which is part of the
3  oxidizer itself.
4      Q. Did Patco purchase the exhaust blower from
5  Wolverine when it purchased the oxidizer?
6      A. Yes.
7      Q. It was included?
8      A. The blower and the stack are included as
9  part of that package.
10     Q. And were any control panels included in
11 Patco's purchase of the oxidizer?
12     A. Right. One control panel, this NEMA 12
13 control panel was included.
14     Q. And that was included in the price that's
15 quoted in this proposal on the first page?
16     A. Yes, it is.
17     Q. Did Wolverine design the control panel, to
18 your knowledge?
19     A. Yes.
20     Q. Did Wolverine manufacture the control
21 panel?
22     A. Yes, they did, to my knowledge.
23     Q. Did any specific individual from Wolverine
24 have engineering duties with respect to this

24

1  particular sale between Wolverine and Patco?
2      A. Usually there's an engineer assigned to
3  each particular contract. Who that person was at
4  the time, I don't know.
5      Q. But was there, in fact, a Wolverine
6  engineer assigned to this particular --
7      A. At least one, sure.
8      Q. -- proposal?
9          Do you know who from Wolverine would
10 have knowledge as to who that engineer was that was
11 assigned to this project?
12     A. Stan Woodworth was the engineering manager
13 at the time. He hasn't been at Wolverine for, my
14 guess is six or seven years. So he would know who
15 did it.
16     Q. Would Stan have done it?
17     A. No. I'm sure Stan would not have done it.
18 He would have assigned the project to somebody.
19     Q. Do you know who Conrad Orcheski is?
20     A. He was an engineer at Wolverine for a few
21 years.
22     Q. Could he have been the individual that was
23 assigned to the Patco/Wolverine project?
24     A. He could have been. I don't know if he was

25

1  or not.
2          (Marked, Exhibit 192, terms and
3  conditions, Bates WPS 00039A [marked on back].)
4      Q. Mr. Long, I'm going to hand you a document
5  that's been marked as Exhibit 192. If you'd take a
6  look at that.
7      A. (Witness reviewing document.)
8      Q. This exhibit is identified by Bates stamp
9  WPS 00039A.
10     A. Yes.
11     Q. Have you ever seen this document before?
12     A. Yes.
13     Q. Could you tell us what it is?
14     A. These are the standard terms and conditions
15 for sale.
16     Q. For sale of what?
17     A. For any equipment that Wolverine sells.
18     Q. So was this terms and condition page
19 included in all of Wolverine's sales contracts?
20     A. Yes. This was published on the back of
21 this front page here. It obviously doesn't come out
22 on a one-sided copy, but this was prepublished on
23 the back of this proposal page. So...
24     Q. Right now you're telling us it was included

8 (Pages 26 to 29)

30(b)(6) Deposition by Eric K. Long - 1/6/2004

26

1  on the back of this proposal page. Could you just
2  tell us what page you're referring to?
3      A. Yes. Excuse me. 000039.
4      Q. Okay. And you're looking at Exhibit --
5      A. On the back of the first page, right.
6      Q. And that's Exhibit No. 191?
7      A. Yes, it is.
8      Q. Were these terms and conditions typically
9  included in Wolverine's proposals?
10     A. Yes.
11     Q. Are you aware if these terms and conditions
12 were part of the proposal to Patco dated January 22,
13 1991?
14     A. Yes, they were.
15     Q. And how are you aware of that?
16     A. Before the original goes out, I review and
17 I sign, and I did, and I signed it, and it was done.
18     Q. So you would have made sure that Exhibit
19 192 was included in the Patco proposal, January 22,
20 1991 proposal?
21     A. Yes.
22     Q. With respect to Patco's purchase of the
23 thermal oxidizer, did Wolverine provide any manuals
24 with the purchase?

27

1      A. Yes, they did.
2      Q. And what types of manuals did they provide
3  to Patco?
4      A. It's called an O&M manual, operations and
5  maintenance manual, I believe, or safety manual.
6      Q. If you could just take a look at Exhibit
7  No. 191 again, and turn to the last page.
8      A. (Witness reviewing document.)
9      Q. Under section H, paragraph 5, it states
10 that three manuals would be furnished containing
11 start-up, shutdown, operation and maintenance
12 instructions, et cetera. Was Wolverine referring to
13 three separate manuals or three copies of one
14 manual?
15     A. I believe there'd be one original and two
16 copies. I believe that's the way it went.
17     Q. So this reference to three manuals was
18 actually just three copies of one manual?
19     A. Yes.
20         (Marked, Exhibit 193, instruction
21 manual, Bates PTC 0058-0120.)
22     Q. I'm going to hand to you a document that
23 has been identified as Exhibit No. 193. It's
24 referenced by Bates stamp numbers PTC 0058 through

28

1  PTC 0120. If you want to take a moment just to
2  briefly look through that.
3      A. Sure.
4          (Witness reviewing document.)
5      Q. Do you recognize Exhibit No. 193?
6      A. Yes.
7      Q. Is Exhibit 193 the manual that is referred
8  to in page 5 of Wolverine's proposal?
9      A. Yes.
10     Q. Does Exhibit 193 appear to be -- first of
11 all, tell us what Exhibit 193 is.
12     A. It is the instruction manual for the
13 thermal oxidizer system.
14     Q. And this was the manual that Wolverine
15 provided to Patco with the purchase of the oxidizer?
16     A. Yes.
17     Q. Is this the only manual that Wolverine
18 provided to Patco?
19     A. Yes, as far as I know.
20     Q. Does Exhibit 193 appear to be a complete
21 copy of that instruction manual?
22     A. It appears to me, yes.
23     Q. I'm going to hand you a document that has
24 been previously marked as Exhibit No. 82 in this

29

1  matter, and I don't need you to look through every
2  page of this --
3      A. Thank you.
4      Q. -- but if you look -- if you take a look at
5  Exhibit No. 193 again, and you look at the table of
6  contents, does this instruction manual appear to
7  have ten chapters, according to the table of
8  contents?
9      A. I don't see it marked as ten.
10     Q. You don't see the table of contents
11 indicating that there's ten chapters?
12     A. I see that. I don't see the sections that
13 say ten.
14     Q. Okay.
15     A. They might not have been marked. I don't
16 know.
17     Q. To your knowledge, did this Wolverine
18 instruction manual contain ten chapters?
19     A. It should have. I would think so. That's
20 at the end of the process. I'm up front of the
21 sales area, so I would think so, yes.
22     Q. Would Patco, in its purchase of the thermal
23 oxidizer, have been provided by Wolverine a complete
24 copy of the instruction manual with ten chapters?

**42**

1    A. Like I say, I wasn't involved in this one.
2 It seems reasonable to me that this could be the
3 proposal.
4    Q. If you look at the first page of Exhibit
5 No. 195, there's six numbered paragraphs, and the
6 first numbered paragraph says that, "Belt material
7 will be selected to meet the requirements of the
8 solvents listed." To your knowledge, when Patco
9 purchased the coater from Wolverine in 1990, did it
10 also purchase a conveyor belt?
11    A. I wasn't involved with this project. So
12 I'm not trying to be elusive. I just don't know the
13 answers to your questions.
14    Q. Sure. Looking at the documents, are you
15 able to answer that question?
16    A. The coater in question had two rolls and a
17 small little conveyor hanging off the end of it. So
18 I would surmise that that was that belt.
19    Q. Do you know if Patco accepted the proposal
20 contained in Exhibit No. 195?
21    A. I don't know if they accepted it or not.
22 Like I say, I wasn't involved in the coater
23 purchase.
24    Q. Do you know if Wolverine did the

**43**

1 installation of the coater head at Patco's facility?
2    A. I don't know that.
3    Q. Is there any way to be able to tell whether
4 or not Wolverine did the installation, based on the
5 documents contained in Exhibit No. 195?
6    A. Well, assuming that they accepted based on
7 this proposal, the installation is not included
8 here. So if they did purchase off this document,
9 installation would not be included.
10    Q. If you want to take a look at Exhibit 191
11 again, that's the initial proposal for the thermal
12 oxidizer.
13    A. Sure.
14    Q. Looking at the first page of this proposal,
15 it references the purchase of one complete 5000 SCFM
16 thermal oxidizer, is that right?
17    A. Yes.
18    Q. What does SCFM stand for?
19    A. Those letters stand for standard cubic feet
20 per minute.
21    Q. Do you know whether or not Patco
22 specifically requested the purchase of a 5000 SCFM
23 thermal oxidizer or whether Wolverine recommended
24 this type of oxidizer to Patco?

**44**

1    A. I don't recall that.
2    Q. Are you aware of anyone at Wolverine who
3 would be able to recall that?
4    A. No. No, I'm not.
5    Q. Now, does the 5000 SCFM refer to the
6 capacity of the oxidizer?
7    A. With respect to air volume, yes.
8    Q. How does Wolverine determine the necessary
9 capacity for a particular oxidizer unit?
10    A. It's either calculated based on process
11 conditions, or given to Wolverine by the customer.
12    Q. Do you know in this situation whether it
13 was given to you by Patco?
14    A. I don't recall that.
15    Q. Is there any way of finding out whether
16 Patco provided that to you?
17    A. You could ask Bill Wilbur, who is the
18 president of -- was the president of Patco at the
19 time. But at Wolverine, I don't think there would
20 be anyone that would recall that.
21    Q. If Wolverine did, in fact, do the
22 calculations, would Wolverine have a record of that?
23    A. Yes, I'm sure they would, if they did it.
24    Q. Now, in the early '90s, was Wolverine in

**45**

1 the business of designing thermal oxidizer units?
2    A. Yes.
3    Q. Were they in the business of manufacturing
4 them?
5    A. Yes.
6    Q. So if Wolverine designed a thermal
7 oxidizer, would they be the company who would also
8 manufacture it?
9    A. Yes.
10    Q. In the early '90s, was Wolverine in the
11 business of installing thermal oxidizers?
12    A. No. It was offered as a service, but
13 typically customers would install it themselves.
14 Our skill set was focused towards design and
15 manufacturing, not installation work. In other
16 words, we didn't have the trucks and the personnel
17 to go out and do it in a timely manner versus a
18 company focused on installations.
19    Q. Did Wolverine ever install a thermal
20 oxidizer?
21    A. Yes. Oh, yes. They have installed them,
22 but it wasn't the primary focus.
23    Q. Okay. Was Wolverine, in the early '90s, in
24 the business of repairing and maintaining thermal

30(b)(6) Deposition by Eric K. Long - 1/6/2004

46

1  oxidizers?
2      A. Under contract. If a customer wanted to
3  purchase maintenance or service, they could do so.
4      Q. From Wolverine?
5      A. Yes.
6      Q. Prior to preparing the proposal identified
7  as Exhibit No. 190 and 191, did Wolverine travel to
8  Patco's facility?
9      A. I'm sure I did, yes.
10     Q. Do you know, when you traveled to Patco's
11 facility prior to preparing the proposal, where that
12 facility was located?
13     A. Yes. That was actually in -- I think it
14 was Pawtucket. Yeah, that's right. Pawtucket.
15     Q. And why did you travel to Pawtucket prior
16 to preparing the proposal?
17     A. It's a typical sales function, meet with a
18 customer.
19     Q. Did you also view the facility?
20     A. I viewed that facility, yes.
21     Q. Were you aware whether or not the thermal
22 oxidizer that Patco was inquiring about would be for
23 that facility in Pawtucket, or whether it would be
24 for another facility?

47

1      A. My recollection was that it was for another
2  facility. They didn't need an oxidizer for the
3  Pawtucket facility. It was grandfathered in, I
4  believe.
5      Q. Did you view the coating line while you
6  were at Pawtucket meeting with Patco?
7      A. I don't recall that. I don't remember.
8      Q. Were you aware that the thermal oxidizer
9  was going to be integrated into a coating line at
10 that point in time?
11     A. All I was aware of was that it would take
12 care of solvents emitted from their process. So
13 what that coating line was, I didn't know at the
14 time, no.
15     Q. And you didn't feel it was necessary to
16 view or evaluate the coating line prior to preparing
17 the proposal for the oxidizer?
18     A. No. I think it's valuable to do that in
19 any case, but my recollection is that the dryer
20 which was going to be installed was not the one that
21 was in place in Pawtucket. Now, that's my
22 recollection. I could be wrong about that, but I
23 believe that's the case.
24     Q. Meaning that the dryer currently at the

48

1  Pawtucket facility was not going to be the same
2  dryer that was going to be used by Patco at the
3  Bristol facility?
4      A. That's my recollection, yes.
5      Q. Did anyone else from Wolverine meet with --
6  besides yourself -- meet with Patco in Pawtucket?
7      A. Not to my knowledge. I don't know that,
8  but when I visited, I was by myself.
9      Q. Okay. Do you know how many times you
10 visited?
11     A. I don't remember, no.
12     Q. Do you know if it was more than once?
13     A. I did meet him more than once. Whether it
14 was at Pawtucket or Bristol, I'm not -- I don't
15 recall that.
16     Q. When you say "him," do you mean --
17     A. Bill Wilbur.
18     Q. -- Bill Wilbur?
19     A. Sure.
20         MR. WALKO: This is what time frame?
21         THE WITNESS: This is before the sale of
22 the oxidizer.
23     Q. Prior to preparing the proposal, the
24 January 1991 proposal.

49

1          When you went to Patco's facility in
2  Bristol, do you know whether or not there was an
3  existing air pollution control system in place at
4  that facility?
5      A. There was not one. The building wasn't up
6  yet. So there was no equipment there. It was a
7  greenfield site.
8      Q. When you say the building wasn't up, are
9  you referring to the facility in Bristol or the
10 facility in Pawtucket?
11     A. Excuse me. The facility in Bristol was not
12 yet built. So there was no equipment there, so...
13     Q. When you traveled to Patco's facility in
14 Pawtucket, Rhode Island, do you know whether or not
15 there was an existing air pollution control system
16 in place at Pawtucket?
17     A. I don't know that, no. I don't recall
18 that.
19     Q. At the time you were preparing the proposal
20 for the thermal oxidizer, were you aware that the
21 thermal oxidizer would need to be integrated into
22 the coating line?
23     A. I was aware that the oxidizer would destroy
24 solvents from a process. So I don't necessarily

**Page 50**

1   agree with your language of integrated. That was
2   their responsibility to install the oxidizer and
3   provide the interlocks and so forth, so it would
4   perform the function of destroying the solvents
5   at -- it was 98 percent destruction efficiency.
6       Q. At the time you were preparing the
7   proposal, you weren't concerned with what the
8   thermal oxidizer would actually be integrated with?
9       A. As far as process, no. As long as they
10  gave us the correct information as far as the
11  solvents that needed to be destroyed. See, these
12  oxidizers go on paint booths. They go on tape
13  lines. They go on automotive factories. So there's
14  a whole bunch of applications for these oxidizers.
15      Q. So prior to preparing the proposal,
16  Wolverine felt that it was necessary to find out
17  what sort of solvents and chemicals that Patco used
18  in its tape-making process?
19      A. In order to provide the warranty we would
20  have to do that, yes, for the destruction efficiency
21  guarantee.
22      Q. So in determining what type of thermal
23  oxidizer Patco would need at its facility, was it
24  necessary for Wolverine again to know what sort of

**Page 51**

1   components or machines the thermal oxidizer would be
2   integrated with?
3       A. Not necessarily machines, but the process
4   and the solvent types that are coming into the
5   oxidizer. It's valuable to know that information --
6   I'm not saying it's -- anything you can learn along
7   the way, but as far as the performance of the
8   oxidizer goes, the solvents are the key factor.
9       Q. And did Patco provide you with information
10  on the types of solvents that it was using in its
11  tape-making process?
12      A. Yes.
13      Q. Who from Patco provided you with that
14  information?
15      A. Bill Wilbur.
16      Q. Did you request Patco to provide you with
17  any other information prior to preparing the
18  proposal?
19      A. I don't recall what I requested.
20      Q. Would you request any sort of blueprints or
21  drawings from Patco concerning the coater line?
22      A. Like I say, anything you can glean from
23  their facility would be helpful, but I don't know if
24  that was supplied to me, or I don't know if I asked

**Page 52**

1   for that in the development of the proposal.
2       Q. Would it be necessary to develop the
3   proposal?
4       A. That information is not. Just the solvent
5   rates and types.
6       Q. Okay. Do you know whether or not Wolverine
7   provided installation services to Patco with respect
8   to the 1991 purchase of the thermal oxidizer?
9       A. If they offered it?
10      Q. No. Whether or not they actually provided
11  installation services.
12      A. I'm sure they did not.
13      Q. How are you certain of that?
14      A. Based on my recollection, and also by the
15  fact that this -- the proposal which they accepted,
16  I believe, is Exhibit 191, was for the equipment
17  only.
18      Q. Okay. If Patco chose to, could they have
19  purchased installation services for this oxidizer
20  from Wolverine?
21      A. If they chose, we would offer a separate
22  proposal for that, either at an hourly rate or a
23  firm proposal, yes.
24      Q. And that would be at an additional cost to

**Page 53**

1   Patco?
2       A. Yes.
3       Q. Typically if Wolverine did not provide
4   installation services to its customers, would
5   Wolverine recommend to the customer certain
6   installers that they would prefer the customers to
7   use?
8       A. We wouldn't push or recommend one company
9   or another. Since we provided equipment throughout
10  the world and the country, it was usually a local
11  resource that installed, whether it's an oxidizer or
12  dryer or what have you.
13      Q. So typically it would be the customer who
14  would seek out the installer?
15      A. Yes.
16      Q. Do you know whether or not Wolverine
17  recommended a particular installer to Patco for the
18  installation of the thermal oxidizer?
19      A. I don't know if we did or not.
20      Q. Do you know whether or not anyone from
21  Wolverine would have knowledge of whether or not
22  Wolverine recommended a certain installer to Patco?
23      A. I don't know that either. We weren't in
24  the business of recommending one installer versus

30(b)(6) Deposition by Eric K. Long - 1/6/2004

---

90

1    Q. If you could just briefly read to yourself
2  section 2.3. It's labeled safety precautions.
3    A. (Witness reviewing document.)
4      Okay.
5    Q. The last sentence of that paragraph on that
6  page states, "Strict compliance with these codes, as
7  well as strict adherence to installation
8  instructions are the responsibility of the user and
9  are necessary for safe operation of this Jetzone
10  equipment." When the manual is referring to
11  installation instructions, are these instructions
12  that are provided by Wolverine to the customer?
13    A. I'm sorry. Could you ask that again? I
14  was reading this again.
15    Q. Sure.
16    A. Thank you.
17    Q. Section 2.3 of the manual references
18  installation instructions, and it states that
19  "strict adherence to installation instructions are
20  the responsibility of the user."
21    A. Mm-hmm.
22    Q. These installation instructions that are
23  being referred to, are these instructions provided
24  by Wolverine to the customer?

---

91

1    A. No. I think what they're referring to here
2  is installation instructions per code. So if an
3  installer comes up and says, "We're ready to install
4  your job," they need to be aware of the necessary
5  installation instructions for safety and so forth.
6  So we would have some compliance, like I mentioned
7  earlier, for installation, but I believe that goes
8  to general installation instructions as referenced
9  in these codes.
10    Q. So it wouldn't be Wolverine providing these
11  installation instructions that are referenced in the
12  instruction manual?
13    A. The installation instructions, like I say,
14  are for -- these relate to these codes. We would
15  give installation guidelines.
16    Q. But the installers would be responsible for
17  figuring out what needed to be installed?
18    A. The installers, right. I think at the end
19  of the day the user is, but the installers would
20  need to do that, yes.
21    Q. Would it be the users who had the ultimate
22  responsibility for making sure that specific safety
23  requirements that were required by codes would be
24  installed on the oxidizer?

---

92

1    A. I'm sorry. Please repeat.
2    Q. Ultimately would it be the responsibility
3  of the user of the thermal oxidizer to have
4  installed safety requirements on the oxidizer that
5  were required by any authority or codes?
6    A. As far as installation goes, but as far as
7  safety equipment on board as required from the
8  design of the equipment, that would already be
9  included as part of the oxidizer.
10    Q. By Wolverine?
11    A. Right.
12    Q. Right. Okay.
13      MS. LONG: Okay. Do you want to stop
14  now?
15      MR. WALKO: It is 1:30. Yes, let's have
16  lunch.
17      (Luncheon recess.)
18      MS. LONG: Back on the record.
19    Q. Now, in approximately 1993, 1994, do you
20  know if Patco purchased a heat recovery system from
21  Wolverine?
22    A. Yes, they did.
23      (Marked, Exhibit 200, letter, 2/11, with
24  attachment, Bates WILB 0166-0173.)

---

93

1      (Marked, Exhibit 201, heat recovery
2  system proposal, Bates WILB 0174-0182.)
3    Q. I'm going to hand you actually two
4  documents that have been collectively marked as
5  Exhibit No. 200. They are identified by Bates
6  stamps WILB 0166 through WILB 0173.
7      I'm also going to hand you a second
8  document marked as Exhibit No. 201, identified by
9  Bates stamp WILB 0174 through WILB 0182.
10    A. Yes.
11    Q. Focusing your attention on Exhibit No. 200,
12  it appears to be a cover letter which is identified
13  by WILB 0166, and then a Wolverine proposal, dated
14  February 11, 1993, is that right?
15    A. Yes.
16    Q. And could you tell me what the February 11,
17  1993 proposal refers to?
18    A. A Wolverine heat recovery system.
19    Q. Then if you look at Exhibit No. 201, it's a
20  Wolverine proposal, dated November 29, 1993. Does
21  that also appear to be a Wolverine proposal for the
22  heat recovery system?
23    A. Yes.
24    Q. And is the November 29, 1993 proposal a

---

94

1  revision of the February 11, 1993 proposal?
2     A. Yes.
3     Q. Do you know whether or not the November 29,
4  1993 proposal was, in fact, accepted by Patco?
5     A. It seems to me it was. It says, "Thank you
6  very much for your order" and references a purchase
7  order. So I believe it is, yes.
8     Q. And what document were you just reading off
9  of?
10    A. Excuse me. That was Exhibit 201.
11    Q. Was that the second document, WILB 0175?
12    A. Yes.
13    Q. Now, with the purchase of this heat
14  recovery system, was Patco provided with any manuals
15  from Wolverine?
16    A. I don't know that.
17    Q. If you could turn to page 6 of that
18  November 29, 1993 proposal, Bates-stamped 182 --
19    A. Okay.
20    Q. -- if you look at paragraph 4 on that page.
21    A. Right.
22    Q. Again, it has similar language to the 1991
23  proposal. "Three manuals will be furnished
24  containing start-up, shut-down, operation," et

95

1  cetera?
2     A. Okay.
3     Q. Again was this three separate manuals
4  provided by Patco or three copies of one manual?
5     A. Three of the same.
6        (Marked, Exhibit 202, instruction
7  manual.)
8     Q. I'm going to hand you a document that just
9  has been marked as Exhibit 202. If you'd take a
10  look at that.
11    A. (Witness reviewing document.)
12    Q. Could you tell me what Exhibit 202 is?
13    A. Instruction manual for heat recovery
14  system.
15    Q. Is this the manual that's referenced on
16  page 6 in paragraph 4 of the Wolverine proposal?
17    A. It looks like it.
18    Q. To your knowledge, would any other
19  Wolverine manuals have been provided with the
20  purchase of the heat recovery system?
21    A. Not to my knowledge.
22    Q. Now, if you notice on Exhibit No. 202, it
23  states "Instruction Manual, heat recovery system
24  phase 1." Was there more than one phase?

96

1     A. There were two phases. I believe that
2  they -- they liked to pay as they went, so they
3  didn't want to borrow from a bank. So phase 1 they
4  could afford, and phase 2 they did subsequently.
5     Q. Do you know if there was a separate
6  instruction manual for the heat recovery system?
7     A. I don't know that. I don't know.
8     Q. Do you know who from Wolverine would have
9  that knowledge?
10    A. Cliff Morse. He's no longer there.
11    Q. Cliff, I'm sorry?
12    A. Morse.
13    Q. M --
14    A. M-o-r-s-e.
15    Q. Could you just generally explain the
16  function of the heat recovery system that was
17  purchased by Patco?
18    A. The heat recovery system as supplied was to
19  send clean, warm air back to the Patco dryer, using
20  the waste heat from the oxidizer. And that's
21  basically the function of the heat recovery system.
22    Q. How would installation of the heat recovery
23  system alter the function of the thermal oxidizer?
24    A. None.

97

1     Q. Would the installation of the heat recovery
2  system have any effect on the thermal oxidizer that
3  was currently being used at Patco?
4     A. As far as performance of the solvent
5  destruction efficiency, no.
6     Q. Would it have any other effect on the
7  functioning of the thermal oxidizer?
8     A. It should not.
9     Q. Were there additional control panels that
10  were needed for the heat recovery system?
11    A. I believe there was just one small control
12  panel with I think a couple of motor starters.
13  Again, I'm not an electrical engineer, but that's my
14  recollection.
15    Q. Did Wolverine provide this control panel?
16    A. Yes.
17    Q. Did Wolverine manufacture the control
18  panel?
19    A. I don't know that to be sure, but my
20  suspicion is yes.
21    Q. Just to go back a bit, do you know if
22  Wolverine manufactured the original control panels
23  for the thermal oxidizer?
24    A. I believe they did, yes.

30(b)(6) Deposition by Eric K. Long - 1/6/2004

98

1    Q. Do you know whether it was Wolverine who
2 recommended to Patco to purchase the heat recovery
3 system?
4    A. Do I know if it was Wolverine who
5 recommended it?
6    Q. Yes.
7    A. I don't know if it was recommended. We
8 always want to try to sell as much as we can, but I
9 don't know if we recommended it or if they
10 approached us with it.
11    Q. You don't know if it was Patco who first
12 called up Wolverine and said, you know, "We think we
13 need a heat recovery system"?
14    A. That is correct. I don't know.
15    Q. Now, as you just testified earlier, the
16 heat recovery system took place in two phases, is
17 that right?
18    A. Yes.
19    Q. Now, did the manufacture of the heat
20 recovery system take place in two phases?
21    A. As I recall it did, yes.
22    Q. Do you know if Patco purchased both phases
23 together?
24    A. I don't know.

99

1    Q. Can you explain what was actually
2 manufactured in each phase of the heat recovery
3 system?
4    A. I might have to scan these documents a
5 little bit, but...
6    Q. Sure.
7    A. It was basically a heat exchanger, some
8 fans, and a small control panel.
9    Q. And that was phase 1?
10    A. That would include both phases.
11    Q. Do you know what exactly was manufactured
12 for phase 1?
13    A. It looks to me like a filter box, a blower
14 with duct work and some exhaust duct work.
15    Q. Do you know what was manufactured for phase
16 2?
17    A. It says here heat exchanger and fresh air
18 blower and warehouse comfort.
19    Q. Do you know who installed each phase of the
20 heat recovery system at Patco?
21    A. I don't recall who did, no. I know it was
22 not Wolverine.
23    Q. Do you know if Wolverine recommended anyone
24 to Patco for installation of the heat recovery

100

1 system?
2    A. I don't know that either.
3    Q. Do you know what the role of Goodhart &
4 Sons was in the installation of the heat recovery
5 system?
6    A. They're a manufacturing resource for
7 Wolverine that can manufacture equipment for us when
8 either our shop is full or there's a time
9 constraint. So they're a manufacturer of equipment.
10    Q. So Goodhart & Sons is not an installer, to
11 your knowledge?
12    A. Oh, they install equipment, yes, they do,
13 but they also have manufacturing abilities.
14    Q. Do you know if Goodhart & Sons installed
15 the heat recovery system at Patco?
16    A. I don't think they did. I think they were
17 just involved with the manufacturing aspect.
18       (Marked, Exhibit 203, letter, 12/5/94,
19 Bates WPS 00263-264.)
20    Q. I'm going to hand you a document that's
21 marked as Exhibit No. 203 identified by Bates stamp
22 WPS 00263 and 264. If you just want to take a
23 moment to look that over.
24    A. (Witness reviewing document.) Okay.

101

1    Q. Exhibit 203 appears to be a letter written
2 by you to Patco Corporation dated December 5, 1994.
3 Did you write this letter?
4    A. Yes.
5    Q. If you look at paragraph 3 of that letter
6 on the first page, it references Goodhart & Sons.
7    A. Mm-hmm.
8    Q. After reviewing this letter, does it
9 refresh your memory as to what Goodhart & Sons
10 actually manufactured with respect to the heat
11 recovery system?
12       MR. WALKO: Objection.
13    Q. You can answer.
14    A. The phase 2 components I believe were
15 fabricated by Goodhart & Sons.
16    Q. Do you know what specific phase 2
17 components were fabricated by Goodhart & Sons?
18    A. The heat exchanger I know was fabricated by
19 them. Other than that, I don't recall in detail
20 what other components were supplied by them.
21    Q. With respect to the heat recovery system
22 for Patco, was Goodhart & Sons a subcontractor of
23 Wolverine?
24    A. They were a manufacturing subcontractor.

FARMER ARSENAULT BROCK LLC

38 (Pages 146 to 149)

30(b)(6) Deposition by Eric K. Long - 1/6/2004

146

1   interlocks?
2       A. I don't think interlocks are a manufactured
3   item. I think it's more of a logic type thing.
4   Again, I'm not an electrical engineer, so check with
5   Dave McAfee on that one.
6       Q. Did Wolverine provide the wiring for
7   interlocks for the thermal oxidizer?
8       A. The panel itself was prewired with all the
9   wiring in it, which was the safeties for the
10  oxidizer. The wiring from the panel to any process
11  point in the interlock is by others. It's by Patco
12  in this case.
13      Q. When you say "panel," are you referring to
14  the NEMA 12 control panel?
15      A. NEMA 12 control panel, right.
16      Q. If a customer purchased installation
17  services from Wolverine with respect to a thermal
18  oxidizer, would Wolverine install interlocks?
19      A. If they purchased the -- that's defined in
20  the proposal. So as you saw with one of the
21  exhibits here, we can provide interlocks, sure.
22      Q. If the customer pays for it?
23      A. If they pay for it, right, and if it's then
24  specified in the proposal.

147

1       Q. Do you know if any of Wolverine's
2   instruction manuals that it provided to Patco,
3   either the instruction manual for the initial
4   purchase of the oxidizer or the instruction manual
5   for the heat recovery system, referenced interlocks
6   in any way?
7          MR. WALKO: Objection.
8       A. I'm not sure of the entire contents of the
9   manual.
10      Q. I understand.
11      A. So I don't know the answer to your
12  question.
13      Q. Do you know if Wolverine ever provided
14  instructions to its customers on how to install
15  interlocks?
16      A. I would strongly think not. It's a site-
17  specific and case-by-case basis. So all of them are
18  different. So there's not one standard to say this
19  interlock has to go with this and so forth. So I
20  don't think we'd have a published standard
21  recommendation on that.
22      Q. Okay.
23      A. But we do make it clear that if it's a
24  pollution control device, they have to interlock so

148

1   there's no solvent going to the atmosphere if the
2   oxidizer is not operational.
3       Q. When you say "they," you're referring to --
4       A. A customer.
5       Q. -- the customer?
6       A. Right.
7       Q. You would recommend that the interlocking
8   needed to be done, but you would not provide
9   instructions on how to perform that interlocking?
10      A. Right. That's up to them.
11      Q. Did Wolverine provide any documentation to
12  its customers concerning interlocks, to your
13  knowledge?
14      A. I don't know that.
15      Q. Do you know who from Wolverine would have
16  that knowledge?
17      A. Check with Dave McAfee.
18      Q. Okay. Did Wolverine typically discuss
19  interlocking with its customers?
20      A. We would say that their process needed to
21  be interlocked with the controls of the oxidizer so
22  that they wouldn't be out of compliance.
23      Q. How would you communicate this to the
24  customers?

149

1       A. It could be a phone conversation, or it
2   could be a case-by-case cover letter or something
3   like that.
4       Q. Do you know if interlocking was ever
5   discussed with anyone from Patco?
6       A. They were aware of the interlocking, and so
7   I don't know -- I don't recall talking about
8   interlocks with anybody. I just don't recall those
9   details. They were aware, just by the fact that
10  they had to buy an oxidizer, they were aware they
11  had to interlock their dryer with the oxidizer.
12      Q. How did you know Patco was aware they had
13  to interlock the oxidizer with the dryer?
14      A. There'd be no reason to purchase an
15  oxidizer otherwise. In other words, they're
16  required by the state and the federal government to
17  install the pollution control device, which destroys
18  the solvents. And so if they are producing airborne
19  solvents, they are obligated by law to destroy
20  those. So, you know, if they don't, it's at their
21  own risk, in which case they're usually asked to
22  cease and desist, I guess is the way you'd put it.
23  So it's just by -- that's just the nature of the
24  beast. You buy one of these, you have to interlock

FARMER ARSENAULT BROCK LLC

48 (Pages 186 to 189)

30(b)(6) Deposition by Eric K. Long - 1/6/2004

186

1  piece of equipment, basically.
2     Q. And what was that piece of equipment?
3     A. It's called an LEL monitor.
4     Q. What did it do?
5     A. It basically senses the amount of solvent
6  in the air, basically, or it can be reported as
7  concentration of solvent in air.
8     Q. Were there any exclusions associated with
9  that proposal?
10    A. Any installation, exhaust duct work,
11  freight, piping and spare parts.
12    Q. Do you know if that proposal was accepted?
13    A. I believe it was, yes.
14    Q. And the exclusion as to installation, what
15  did that mean?
16    A. Patco is responsible for installing
17  equipment after it arrives.
18    Q. And exclusion as to exhaust duct work, what
19  did that mean?
20    A. Same. If we supplied duct work -- well,
21  excuse me -- exhaust duct work is not included. So
22  we're not supplying any duct work in this case.
23    Q. The exclusion as to freight, what does that
24  mean?

187

1     A. Same. They pay the freight bill for the
2  equipment from Wolverine to Patco.
3     Q. And exclusion as to wiring and piping, what
4  does that mean?
5     A. All on-site wiring, facility wiring,
6  process wiring and piping, same pneumatics, natural
7  gas piping and so forth.
8     Q. That would be excluded?
9     A. Excluded.
10    Q. And their responsibility?
11    A. Yes.
12    Q. And any interlocks associated with that
13  wiring, would that be excluded as well?
14    A. Excluded.
15    Q. On Exhibit 191, the thermal oxidizer
16  proposal, there were exclusions on that proposal as
17  well, correct?
18    A. Mm-hmm.
19    Q. Is that a yes?
20    A. Yes. Excuse me.
21    Q. And you talked about some of those
22  exclusions?
23    A. Yes.
24    Q. As far as some of the other exclusions --

188

1  exclusion number 6 in section G, tie-in of utilities
2  to main panel, what did that mean?
3     A. The main oxidizer panel, as I discussed
4  before, came prewired, and any wiring and tie-in of
5  utilities from our panel to those utilities and the
6  wiring itself is not included.
7     Q. Exclusion number 5 talks about all raw
8  material and utility costs which may be incurred
9  during start-up, debugging and testing. What did
10  that mean?
11    A. That means when they start up the
12  equipment, they have solvent, they have film, they
13  have natural gas that they need to support their
14  operation, and Wolverine is not responsible for the
15  supply or cost of those.
16    Q. On section D of the proposal, could you
17  read that into the record, please.
18    A. Section D, "Installation and/or start-up
19  assistance: We will provide installation and/or
20  start-up assistance, if desired, at a rate of $480
21  per man, per eight-hour day, plus all living and
22  travel expenses. Overtime is at $90 per hour,
23  except on Sundays and holidays, which is at $120 an
24  hour. Expenses are billed at cost. Travel time is

189

1  billed at $55 per hour Monday through Friday, and
2  $75 per hour Saturday and Sunday."
3     Q. You had previously talked about
4  installation services that may have been offered at
5  different times to different customers. Did, to
6  your memory, Patco purchase installation services
7  regarding this project?
8     A. No.
9     Q. On the design specifications, the next
10  section down, section E, what were the design
11  specifications for this project for the solvent
12  constituents?
13    A. Ask that again, please.
14    Q. What were the design specifications for
15  this project for the solvent constituents?
16    A. Lactol and hexane.
17    Q. Were there any other solvents that were
18  included in the design specifications for this
19  project?
20    A. I don't know the answer to that.
21    Q. Would it have been your practice to include
22  all of the design specified solvent constituents in
23  the proposal to which Wolverine was responding?
24    A. Yes. That information needs to come from

30(b)(6) Deposition by Eric K. Long - 1/6/2004

198

1    Q. So when you mentioned that if there were
2  any such calculations, they might be in some
3  records, how does that answer or jibe with this
4  purchase by Megtec?
5        MR. WALKO:  Objection.
6    Q. Would those records have been transferred
7  to Megtec, perhaps?
8    A. Yes.
9    Q. Is that your understanding?
10   A. I don't know whether calculations were done
11  for this project, and if they were, if they were
12  sent to Megtec; but the agreement with Megtec was
13  that they would take all documents pertaining to the
14  pollution control systems.
15   Q. How does one conduct a solvent destruction
16  efficiency test on the stacks in a situation like
17  Patco?
18   A. I would defer you to Vinny Davignon on
19  that, Matt. He ran the tests, and he'll explain it
20  much better than I can, but in effect what you do is
21  you have a probe, and you sense the amount of
22  incoming solvent to the pollution control device.
23  Then you have a test port on the stack, which is on
24  the clean side, and then you compare those two

199

1  values, and through the math, you can say 98 percent
2  destruction efficiency, or whatever the value
3  happens to be.
4    Q. And in Patco's case, was this kind of test
5  performed outside the building, as far as the people
6  where they were standing?
7    A. Yes. You'd have to be physically outside
8  the building to get the stack results, yes.
9    Q. Referring you to the November 1993 proposal
10  on the heat exchange system. I'm trying to get the
11  number for you here.
12   A. Unfortunately I didn't put them in order
13  here.
14   Q. Exhibit 201.
15   A. Yes.
16   Q. Exhibit 201, on the page marked WILB 0177,
17  do you see some small print at the bottom of that
18  page?
19   A. Yes, I do.
20   Q. What does that say?
21   A. "All orders based on this quotation are
22  subject to acceptance by Wolverine (Massachusetts)
23  Corporation. The conditions on the reverse side
24  form a part of this quotation."

200

1    Q. Do you recall if there were conditions on
2  the reverse side of the quotation that you signed
3  and sent to Patco?
4    A. Yes. Like we mentioned before, those terms
5  and conditions were on the opposite side of this
6  cover page.
7    Q. And were those terms and conditions also on
8  the pre-printed form as you described earlier?
9    A. Preprinted, yes.
10   Q. And they, in fact, were included in the
11  proposal that you made regarding this heat recovery
12  system?
13   A. Yes.
14        MR. WALKO:  May I have this marked as
15  the next exhibit.
16        (Marked, Exhibit 222, heat recovery
17  system proposal.)
18   Q. I'm going to show you Exhibit No. 222,
19  which consists of pages WPS 116, 117, 118, 119,
20  119A, 120, 121, 122, 123 and 124, and ask you if you
21  recognize that document.
22   A. Yes.
23   Q. What is that?
24   A. That is the proposal for the Wolverine heat

201

1  recovery system.
2    Q. The very same proposal we've just been
3  talking about, correct?
4    A. Yes.
5    Q. Do the standard terms and conditions appear
6  anywhere in that document?
7    A. Yes.
8    Q. On what page?
9    A. 00119A.
10   Q. And did those terms and conditions appear
11  on the proposal that you sent to Patco concerning
12  the heat recovery system project?
13   A. Yes.
14   Q. Were there any exclusions associated with
15  the heat recovery system project?
16   A. Yes.
17   Q. And the exclusions, just look down the list
18  under section G, read them to yourself.
19   A. (Witness reviewing documents.)
20   Q. Are there any exclusions that would have
21  covered wiring?
22   A. External wiring and piping at the job site,
23  sure. Tie-in of utilities, that would apply.
24   Q. And what did the tie-in of utilities

202

1    exclusion mean?
2        A. That means actually physically making the
3    connection from the utilities to whatever source
4    required that utility.
5        Q. And the exclusion number 6, external wiring
6    and piping at job site, what did that mean?
7        A. Anything external to our control panel,
8    warehouse wiring, process wiring.
9        Q. Did that include interlocks?
10       A. Yes.
11       Q. Who had the responsibility for installing
12   interlocks for the thermal oxidizer project?
13           MS. LONG: Objection. Asked and
14   answered.
15       A. Not Wolverine. It was the responsibility
16   of the customer. So whether they did or somebody
17   else, I don't know that, but it was not Wolverine.
18       Q. The customer being in this case?
19       A. Patco.
20       Q. Who had responsibility for installing
21   interlocks for the heat recovery system project?
22       A. Patco.
23       Q. Did the thermal oxidizer sale, Exhibit 191,
24   which is the proposal there, in January of '91, did

203

1    that discuss a hot gas feedback option?
2        A. Yes.
3        Q. And what's that?
4        A. That sends air back to the process from the
5    oxidizer stack.
6        Q. And did Patco purchase the hot gas
7    feedback?
8        A. Yes.
9        Q. Did there come a time when you became aware
10   that Patco was experiencing some issues with silica
11   dust in their manufacturing process of adhesive
12   tape?
13       A. At some point I was informed of that, yes.
14       Q. What do you recall about that?
15       A. Well, silica dust is a by-product of some
16   of the coatings that they were using. So, in other
17   words, when that particular solvent system was
18   incinerated in the oxidizer, there would be a
19   formation of white silica dust, they call it, and as
20   a result of this hot gas feedback, some of that dust
21   would get back onto their product, making the
22   product unsalable.
23       Q. Was there any specification in the 1991
24   proposal document regarding the thermal oxidizer or

204

1    its design having to do with silica dust?
2        A. No.
3        Q. Did Patco ever inquire of you as to a
4    potential engineering solution to the issue that
5    they were experiencing with silica dust?
6        A. Yes.
7        Q. Tell us about that.
8        A. That was basically the second contract, the
9    9329 contract, which would basically isolate that
10   air which was now polluted with the silica dust,
11   retrieve the heat from that air source in an air-to-
12   air heat exchanger, and send clean air to the dryer,
13   which is free of silica.
14       Q. So the clean air that's being sent to the
15   dryer after this heat exchanger process, where does
16   that air come from under that heat recovery system
17   proposal?
18       A. I believe it comes from the outside.
19       Q. Outside of the building?
20       A. Outside of the building, right.
21       Q. And was that air stream heated in any way
22   before returning to the oven?
23       A. Yes. That's the reason for the heat
24   recovery system, yes.

205

1        Q. Could you just explain how that happens.
2        A. Sure. I'll try. The silica-laden air from
3    the exhaust stack would go through one side of the
4    heat exchanger. Then the fresh outside air we were
5    just talking about goes through the other side.
6        Q. Did the two air streams mix?
7        A. No.
8        Q. How were they separated?
9        A. Through a series of tubes and baffles, heat
10   exchanger construction.
11       Q. By metal?
12       A. Yes.
13       Q. Okay. Go on.
14       A. And that's basically it. You just transfer
15   the heat, but not the silica. So that clean air
16   which was coming from the outside goes into this
17   heat exchanger. I'll call it the clean side,
18   because we called it the clean side. It just takes
19   the heat from the dirty side air and then sends the
20   clean air back to the dryer, and that's it.
21       Q. And what system of fan motors, if any,
22   moved the clean side air through the heat exchanger?
23       A. I think there was a supply fan with that
24   with 7 1/2 horsepower motor, I believe.